IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| THAYER INTERACTIVE GROUP LLC | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:05-CV-01503 (JR) |
| | ) |
| PC SPECIALISTS, INC. | ) |
| | ) |
| Defendant. | ) |

**PLAINTIFF'S MEMORANDUM IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS OR, ALTERNATIVELY, TO TRANSFER**

**I.    Introduction**

Under the well-settled "first-to-file" rule, the earlier filed of two lawsuits takes

precedence unless the party seeking transfer can prove that the first-filing party engaged in

inequitable conduct.  Defendant cannot prove that Plaintiff acted inequitably, and its Motion to

Transfer ("Defendant's Motion") should be denied.

Specifically, Plaintiff, Thayer Interactive Group, LLC (d/b/a "TIG Global"), sought

declaratory relief **only after** Defendant imposed a Hobson's choice on TIG Global – either

accede to Defendant's demands and immediately re-brand its business or wait for Defendant to

sue TIG Global in an inconvenient forum.  Defendant's Motion does not disclose the fact or

substance of a critical conversation among counsel, during which Defendant's counsel left TIG

1

Global with the Hobson's choice by flatly rejecting any resolution that would allow TIG Global to keep its brand name.[1]

When a party is forced to choose between litigation and capitulation in the face of allegations of trademark infringement, filing a declaratory judgment action is appropriate and consistent with the purposes of the Declaratory Judgment Act ("DJA").

The Court also should deny Defendant's Motion because Washington, D.C. is the most convenient forum to resolve TIG Global's legal claims. All of TIG Global's witnesses and documentary evidence are located within this District. Apparently, Defendant's witnesses and evidence are in California. Defendant's Motion would merely shift the burden of litigation from Defendant to TIG Global. Defendant also claims that it has no ties and almost no sales in Washington, D.C. As detailed below in Section II.E, Defendant's public statements and website tout a "Washington, D.C." office, as well as significant and numerous customer relationships in and around the Washington, D.C. area. For all of these reasons, Defendant's Motion should be denied under 28 U.S.C. § 1404(a).

## II.    Factual Background

### A.    The Parties' Unrelated and Noncompetitive Businesses

A brief discussion of the parties' distinct businesses demonstrates why TIG Global thought the dispute was ripe for settlement before it filed the Complaint.

---

[1]    Although Defendant selectively put settlement discussions into the record and, therefore, is in no position to complain, "[b]y its terms, [Federal Rule of Evidence 408] forbids admission of evidence [of settlement discussions] only when it is offered to prove 'liability for or invalidity of the claim or its amount.'" Zurich American Ins. Co. v. Watts Indus., Inc., 417 F.3d 682, 689 (7th Cir. 2005) (quoting Advisory Committee's Note, FRE 408). "The district court has broad discretion to admit evidence for a purpose other than proving liability." Id. In responding to Defendant's Motion, TIG Global offers evidence of settlement discussions to demonstrate that the Complaint in this action was warranted and not for the purpose of proving or disproving liability.

TIG Global is an Internet marketing firm that provides web presence, oversight, and marketing services to the hospitality industry.  Declaration of Susan Heilbronner ¶ 2 ("Susan Heilbronner Dec.").  TIG Global's customers are limited to hotels, hotel chains, real estate information and investment companies, and other lodging and hospitality businesses.  Id.  TIG Global supplements its primary Internet marketing services by offering a limited array of website management services (including design and content updates) for its existing marketing clients.  Id.

In 2001, TIG Global was founded as Thayer Interactive Group, LLC.  Id. ¶ 3.  "Thayer" referred to the ownership group out of which TIG Global was founded, namely, Thayer Lodging Group.  Id.  In October 2004, TIG Global began using the mark TIG GLOBAL as its primary brand name and service mark.  Id. ¶ 5.

Defendant markets and sells a variety of computer hardware and information technology services under the TIG name, which is a descriptive acronym for Defendant's related TECHNOLOGY INTEGRATION GROUP name.  The front page of Defendant's website highlights its core services.  Declaration of Michael Heilbronner ¶ 10, Ex. C (identifying "Enterprise Storage," "B2B eCommerce Integration," "Computer Supplies & Media," "Help Desk and Outsourced IT," "Communication Services," and "Security Services.") ("Michael Heilbronner Dec.").  As TIG Global understands the businesses, none of these services compete with TIG Global's business, and TIG Global has never encountered Defendant in the marketplace.  Susan Heilbronner Dec. ¶¶ 6-7.

### B. Defendant's Threats and Two Options for TIG Global:  Immediately Re-brand or Litigate on Defendant's Terms

On July 20, 2005, Defendant's counsel, Peter Hahn, sent a letter to TIG Global alleging trademark infringement and demanding that TIG Global "immediately cease and desist from any

further use" of the TIG and TIG GLOBAL marks.  Michael Heilbronner Dec. ¶ 2, Ex. A
(emphasis original).  Mr. Hahn issued a July 30, 2005, deadline for TIG Global to fully comply
with Defendant's demands, stating, "failure to fully and immediately comply with this letter will
force [Defendant] to seek redress through the courts."  Id.  Thus, Defendant's initial
communication left TIG Global with two options:  terminate its brand name or wait to face
costly, unnecessary litigation.

Promptly, on July 22, 2005, TIG Global's outside counsel, Michael Heilbronner,
responded to Mr. Hahn by telephone.  Id. ¶¶ 3-5.  Defendant's failure to disclose this
conversation in its Motion is significant because the substance of the July 22 conversation is one
of the main reasons TIG Global acted properly (not preemptively) when it filed the Complaint
for Declaratory Judgment.  Mr. Heilbronner explained to Mr. Hahn that the parties' businesses
do not compete and that the respective marks do not cause a likelihood of confusion.  Id.  ¶ 6.
Mr. Heilbronner also asked Mr. Hahn whether Defendant would consider any resolution that
would permit the parties to coexist and continue to use their respective brand names.  Id. ¶ 7.
Mr. Hahn responded unequivocally that his client would not settle the matter under any
circumstances that included coexistence.  Id. ¶ 8.  Mr. Hahn did not leave the door open for
further discussions.  At the end of the brief, six-minute conversation (id. ¶ 5, Ex. B), Mr. Hahn
did not ask Mr. Heilbronner to contact him again with other ideas for potential settlement, nor
did he indicate that he would be contacting Mr. Heilbronner to discuss settlement.  Id. ¶ 9.
Defendant's message was clear:  TIG Global had to immediately re-brand its business or wait for
Defendant to file suit.

4

**C.    TIG Global's Third Option:  The Declaratory Judgment Act**

TIG Global's strong preference was (and is) an amicable resolution to this matter.  The parties have coexisted for more than a year without confusion, and TIG Global believes there will be no confusion in the future.  TIG Global was not in a position to create a new brand name merely because Defendant demanded it.

Based on the threat of impending litigation, and only after Mr. Hahn's blunt rejection of a resolution that included any form of coexistence, TIG Global filed this action seeking declaratory relief on July 29 – one week after the unfruitful telephone conference between Mr. Hahn and Mr. Heilbronner.

**D.    Defendant Terminates Ensuing Settlement Discussions**

To buttress the impression that TIG Global acted inequitably by filing the Complaint, Defendant raises matters that occurred *after* the filing.  A recap of those events clarifies the record and demonstrates further that TIG Global did not engage in inequitable conduct or lull Defendant into a sense of complacency.

As a final attempt to avoid the expense and inconvenience of litigation, after filing the Complaint, TIG Global again attempted to initiate settlement discussions.  It was hoped that a call between business people (without counsel) would be more fruitful than counsel's July 22 discussion.  Susan Heilbronner Dec. ¶ 8.  During the ensuing conference call, Ms. Heilbronner and TIG Global's CEO, Frederic Malek, explained to Defendant's business representative, Ms. Peggy Loeffler, why (1) TIG Global believed the parties businesses were noncompetitive; and (2) an amicable coexistence arrangement made business sense.  Id. ¶¶ 9-10.  At the end of the call, and as confirmed in Ms. Heilbronner's letter of August 2, 2005 to Ms. Loeffler, Ms.

Loeffler agreed to make a follow-up call to TIG Global. Id. ¶ 10, Ex. A. TIG Global never heard from Ms. Loeffler, and Defendant remained silent for 12 weeks. Id. ¶¶ 11-12.

On October 27, 2005, Defendant's counsel, Mr. Hahn, broke the silence with a letter that rebuked TIG Global for contacting his client about settlement and reiterated Defendant's demand that TIG Global terminate use of its brand or face litigation. Susan Heilbronner Dec. ¶ 12; Ex. B.

In other words, while Defendant's Motion argues that Defendant was interested in discussing settlement, all of Defendant's conduct demonstrate objectively that any such discussions would be limited to the previously articulated Hobson's choice -- capitulate or litigate. After receiving Mr. Hahn's letter, TIG Global served the Complaint.

**E.    Defendant's Presence in and Connections to Washington, D.C.**

Through the testimony of its CFO, Thomas C. Janecek, Defendant's Motion states that it "conducts very little business in the District of Columbia" and that Defendant "has no employees, offices or physical presence of any kind in the District of Columbia." Defendant's Motion at 11; Declaration of Thomas C. Janecek ¶ 7.

TIG Global has not had an opportunity to investigate the accuracy of these representations through discovery. However, Defendant tells a drastically different story on its website and in press releases. These sources demonstrate that Defendant recently opened an office immediately across the Potomac River and trumpets the significance and value of its customers and business in Washington, D.C.

For example, on September 1, 2005, Defendant issued a press release with the headline: **"Technology Integration Group (TIG) Announces 19th Location in Washington, D.C."** Michael Heilbronner Dec. ¶ 13, Ex. F (emphasis added). Apparently, the office is actually located in Vienna, Virginia, but throughout the press release, Defendant refers to the office as its "Washington, D.C.

office."  Id. ("The Washington, D.C. office will be managed by Laura Moon") ("Washington D.C."

identified as location of office in list of offices at the bottom of the press release).

With respect to Defendant's business volume and customers in and around Washington,

D.C., Defendant's President, Bruce Geier, explains the significance of the company's federal

government customers, stating:  "We are pleased to be opening a branch office in the

Washington, D.C. area . . . . Federal government agencies are an important part of our business,

and this office will enable [Defendant] to serve our customers more easily."  Id.  The press

release also provides statements from Defendant's local customers, who tout the importance of

Defendant's Washington, D.C. branch office.  Id.

Defendant's website confirms that the company considers its Vienna, Virginia office to

be a "Washington, D.C." office.  For example, on the page of Defendant's website that lists the

company's branch offices, Defendant lists an office in "Wash D.C." (with a Vienna street

address).  Id. ¶ 14, Ex. G.  As of October 24, 2005, Defendant disclosed that it was staffing its

Washington office with a myriad of employees.  In an interview with the Washington Post

newspaper, Defendant's executive vice president, Chris Ferry, indicated that Defendant was

actively hiring in Washington, stating:

> In Washington, we're looking for engineers with experience in
> enterprise storage and server environments, seasoned federal account
> executives and inside sales representatives.

Id. ¶ 15, Ex. H.  Defendant's Motion diminishes its Washington D.C. presence and business, yet

the city's leading newspaper published an article/interview devoted exclusively to Defendant and

one of the company's senior executives.

Defendant also appears to be opening a new office in Washington, D.C. and, along with

the opening, hosting and promoting a grand opening celebration in Washington, D.C. on January

7

26, 2006.  For this event, a page on Defendant's website announces the "**Grand Opening and Open House Event for TIG DC**" and designates the location as "**TIG DC Office.**"  Id. ¶ 16, Ex. I.  Reading Defendant's Motion, one is led to believe that the Washington, D.C. market is an insignificant afterthought for Defendant, but the company appears eager to generate interest in and buzz about its "newest Office in the DC area," stating:

> TIG is proud to open the doors of our newest Office in the DC area to our valued partners and clients.  This event is to showcase the breadth of capabilities TIG can offer.  The event will be complete with information and demonstrations on cutting edge technologies.  Food, beverages will be supplied as well as chances to win raffle prizes.  This will be a fun and informative event that you won't miss! [sic]

Id.  Access to the Grand Opening and Open House is available through a form on Defendant's website.  Id.

Additional information available on Defendant's website demonstrates why the Washington, D.C. market is so important to Defendant.  Specifically, Defendant is a major certified contractor and supplier to various agencies and departments of the federal government. Defendant's website has significant information about, and portals to web-based purchasing mechanisms for, contracts with the Department of Defense, the General Services Administration, the National Institutes of Health, and the United States Air Force.  Id. ¶ 17, Ex. J.  Defendant has a designated sales representative for its federal contracts – "Craig Leopard, TIG Federal Director" – with a local phone number ((703) 342-5220 x115).  Id. ¶ 18, Ex. K.  In other materials, Defendant designates a "Senior Federal Sales Account Executive" and provides a toll-free phone number to contact that employee.  Id. ¶ 17, Ex. J.

Defendant's statements about its Washington, D.C. contacts and business may be technically accurate (as a formal matter), but there appears to be a significant disparity between the substantive spirit of Defendant's Motion and the public reality.

## III.    Argument and Citation of Authorities

Defendant asks the Court to dismiss this case because TIG Global's Complaint was an improper "preemptive" maneuver.  Alternatively, Defendant requests that the Court transfer the case to California for the convenience of Defendant.  Contrary to Defendant's assertions, this action is properly before this Court and should remain here.

### A.    This Action Is Not an Improper "Preemptive" Lawsuit

"[W]here two cases between the same parties on the same cause of action are commenced in two different Federal courts, the one which is commenced first is to be allowed to proceed to its conclusion first . . . ."  Washington Metropolitan Area Transit Authority v. Ragonese, 617 F.2d 828, 830 (D.C. Cir. 1980) (noting that this had already been the rule in this circuit for more than three decades) (internal citations and quotations omitted).  "The first-to-file rule provides that the court where jurisdiction first attaches should make the determination of the appropriate venue to decide the case, and the second court will decline to act until proceedings in the first court terminate."  Ed Tobergte Associates, Inc. v. Zide Sport Shop of Ohio, Inc., 83 F. Supp.2d 1197, 1198 (D. Kan. 1999).

The first-to-file rule applies in the context of a declaratory judgment action because "the purpose of the Declaratory Judgment Act was to level the playing field when it comes to convenience of forum."  Agridyne Technologies, Inc. v. W.R. Grace & Co., 863 F.Supp. 1522, 1526 n.4 (D. Utah 1994).  As the Supreme Court has stated, the Declaratory Judgment Act gives

the plaintiff "an equal start in the race to the courthouse." Kerotest Mfg. Co. v. C-O-Two Fire Equip. Co., 342 U.S. 180, 185 (1952).

With respect to declaratory judgment actions in trademark infringement disputes, the leading treatise states: "When the parties sue each other in different federal courts, one for a declaratory judgment of non-infringement and the other for infringement, the rule of first-to-file priority dictates that the first-filed declaratory judgment suit be given priority and allowed to continue." J. Thomas McCarthy, McCarthy on Trademarks & Unfair Competition § 32:46 (4th ed. updated 2005) (collecting cases)[2].

None of the limited exceptions to the first-to-file rule applies here. Defendant attempts to wedge TIG Global's conduct into the only arguable exception, inequitable conduct, asserting that TIG Global filed preemptively, misled Defendant about settlement, and raced to its local courthouse. However, at all times, TIG Global's conduct was appropriate and consistent with the purposes of the DJA.

As a preliminary matter, Defendant misapprehends the narrow set of circumstances that justify this exception to the "first-to-file" rule. As one court explained in the context of a declaratory judgment action for non-infringement of a trademark:

> [t]he critical issue appears to be whether the plaintiff in the earlier-filed declaratory judgment action misled the defendant into believing that their dispute could be resolved amicably so that the plaintiff could win the race to the courthouse and therefore choose the forum for the dispute.

---

[2] See Seattle Pacific Industries Inc. v. Levi Strauss & Co., 1997 WL 876921 (W.D. Wash. 1997) ("The first-to-file rule is generally honored by federal courts. . . .[T]he fact that the first-filed case here is for declaratory judgment should not weigh against retaining it.") (denying motion to dismiss first-filed declaratory judgment suit in Washington where defendant subsequently filed an infringement suit in California); Ed Tobergte Associates, Inc., 83 F. Supp.2d 1197 (first to file rule followed; issuing stay order in second -filed infringement suit to allow first-filed declaratory judgment suit to proceed); Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc., 2002 WL 31521091 (S.D.N.Y. 2002) (denying motion to dismiss first-filed declaratory judgment suit).

K Mart Corp. v. Key Indus., 877 F. Supp. 1048, 1053 (E.D. Mich. 1994) (denying motion to dismiss first-filed declaratory judgment suit).  "[C]ourts [in trademark infringement actions] have refused to dismiss a declaratory action where the defendant sent the plaintiff a cease-and-desist letter and . . . the plaintiff filed the declaratory action justifiably believing that further settlement negotiations would be fruitless."  Id. at 1054 (citing Agridyne Technologies, 863 F.Supp. at 1522).

The facts in K Mart Corp. are strikingly similar to the facts in this case.  There, the declaratory-judgment defendant, Key, sent an aggressive cease-and-desist letter to declaratory-judgment plaintiff, K Mart, demanding that K Mart cease all use of the allegedly infringing trademarks or face a lawsuit.  Id.  A subsequent letter from Key reiterated the initial demands and conditioned any resolution on K Mart's full compliance with Key's demands.  Id.  Before filing the declaratory judgment complaint, K Mart's counsel called Key's counsel and explained that K Mart desired to settle the matter with a coexistence arrangement that would avoid consumer confusion and satisfy Key's concerns.  Id. at 1054-55.  Ultimately, K Mart determined that, absent complete compliance with Key's demands, there would be no settlement, and K Mart filed the declaratory judgment complaint.  Id. at 1054.

As with Defendant in this case, Key sought dismissal of the declaratory judgment complaint on the ground that it was a preemptive strike filed during settlement discussions.  Denying Key's motion and adhering to the first-to-file rule, the Court highlighted K Mart's belief that there would be no settlement, stating:

> Kmart justifiably believed that further negotiations were pointless.  Key contends that settlement negotiations were in progress, but based on the written correspondence in this dispute, Kmart justifiably believed that Key would accept nothing short of total capitulation. . . . [The parties' correspondence] indicates that Key would accept no settlement short of total capitulation.

Id. at 1054-55. See also Agridyne Technologies, Inc., 863 F.Supp. at 1527 ("At this point [declaratory-judgment plaintiff] was justified in believing that further negotiations were pointless. Thus, granting precedence to [defendant's] choice of forum (as opposed to [plaintiff's] first filed preference) would not promote the policy of encouraging negotiation and settlement.") (denying defendant's motion to transfer a trademark infringement dispute); Mastercard Int'l Inc. v. First Nat. Bank of Omaha, Inc., 2002 WL 31521091 at *1 (S.D.N.Y. 2002) ("there were no meaningful settlement discussions between the parties such that [declaratory judgment plaintiff] can be accused of using those discussions to lull [defendant] into delaying the filing of its own lawsuit while [plaintiff] prepared to file the first suit.") (denying motion to transfer declaratory judgment action of non- infringement of a trademark).

Likewise, here, Defendant's initial cease and desist letter (see Michael Heilbronner Dec. ¶ 2, Ex. A), combined with counsel for Defendant's blunt rejection of any form of coexistence during counsels' July 22, 2005, phone call (id. ¶¶ 6-9), left TIG Global with the clear impression that settlement in this dispute was not possible absent total capitulation by TIG Global.

TIG Global re-initiated settlement talks after filing this action **only** based on the remote possibility and hope that discussions between business people (without counsel's presence) would be constructive. Susan Heilbronner Dec. ¶ 8. Defendant now seeks to penalize TIG Global for making a last-ditch effort to avoid litigation despite the facts that, before it knew of the Complaint, (1) Defendant did not make the follow-up communication promised by Ms. Loeffler and remained silent for 12 weeks; and (2) Mr. Hahn eventually broke the silence by admonishing TIG Global for contacting his client in the first place. Susan Heilbronner Dec. ¶¶ 8-12, Ex. A and B.

Incredibly, even though Defendant never initiated and only passively participated in settlement discussions, Defendant's Motion contends that TIG Global "feigned interest in resolving this dispute in an effort to deprive [Defendant] of its choice of forum." Defendant's Motion at 4. As demonstrated by Mr. Hahn's and Ms. Loeffler's words, actions, and inaction, nothing could be further from the truth.

Based on the foregoing, TIG Global properly filed its declaratory judgment action against Defendant. Thus, the Court should not dismiss this action as a "preemptive" maneuver that qualifies as an exception to the first-to-file rule. TIG Global acted legitimately, within its rights under the Declaratory Judgment Act. The fact that TIG Global filed in this jurisdiction is both logical (because the company's headquarters is here) and, at worst, benign. See Mastercard Int'l, Inc., 2002 WL 31521091 at *1 ("[declaratory judgment plaintiff] filed suit [for non-infringement of a trademark] in a location with a significant connection to the litigation, undermining any assertion that this forum has been chosen for an improper purpose.").

In short, "[i]f there is to be more than an illusion that a federal forum is to be available for a declaratory judgment plaintiff, the doors to the courthouse must at some point be opened and remain open." Seattle Pacific Industries Inc. v. Levi Strauss & Co., 1997 WL 876921 at * 1 (W.D. Wash. 1997). By limiting TIG Global's options to capitulate or litigate, Defendant opened the doors of this Court. The Court should not punish TIG Global for entering.

**B.**    **This Action Should Not Be Transferred to California for Defendant's Convenience**

In the alternative, Defendant seeks transfer of this action to the Southern District of California pursuant to 28 U.S.C. § 1404(a). Essentially, Defendant argues that it has virtually no ties to Washington, D.C., and, therefore, it would be more convenient for Defendant to litigate in

Defendant's home forum.  As detailed in Section II.E, Defendant's claims about its presence in and around Washington, D.C. are questionable.  Moreover, merely shifting the burden from one party to another is not a valid basis for transfer under 1404(a).

When a defendant seeks transfer under 28 U.S.C. § 1404(a), a "'plaintiff's choice of forum is due substantial deference and, unless the balance of convenience is **strongly** in favor of the defendants, should rarely be disturbed.'"  Int'l Painters and Allied Trades Industry Pension Fund v. Tri-State Interiors, Inc., 357 F.Supp.2d 54, 55-56 (D.D.C. 2004) (emphasis added) (quoting Int'l Bhd. of Painters & Allied Trade Union v. Best Painting & Sandblasting Co., 621 F.Supp. 906, 907 (D.D.C. 1985)).  See also Green v. Footlocker Retail, Inc., 2005 WL 1330686, *2 (D.D.C. 2005) ("Plaintiff's choice should rarely be disturbed unless the balance is strongly in favor of the defendant.") (citing Pain v. United Techs. Corp., 637 F.2d 775 (D.C.Cir. 1980); Armco Steel Co. v. CSX Corp., 790 F.Supp. 311, 323 (D.D.C. 1991) (plaintiff's choice of a "home turf" forum should be afforded strong deference.)).

The moving party under § 1404(a) bears the burden of establishing that transfer is proper. Trout Unlimited v. United States Dep't of Agric., 944 F.Supp. 13, 16 (D.D.C. 1996).  As courts in this District have noted, defendant's burden is high because defendant must prove that its preferred forum would be **significantly more convenient** for the parties or their counsel and **clearly favor a transfer**.  See Green v. Footlocker Retail, Inc., No. CivA-04-1875, 2005 WL 1330686, *2 (D.D.C. June 3, 2005) ("[D]efendants have failed to meet their burden to overcome plaintiff's choice of forum.  In particular, they have failed to show that [their preferred forum] would be **significantly more convenient** for the parties or their counsel.") (emphasis added); Fund for Animals v. Norton, 352 F.Supp.2d 1, 2 (D.D.C. 2005) ("the convenience of parties and witnesses does not **clearly favor** a transfer in this case.") (emphasis added).

14

In this case, Defendant cannot meet its burden because none of the private or public factors[3] that the Court should consider favors transfer under § 1404(a).

### 1. Plaintiff's Choice of Forum and Plaintiff's Ties to this District

Under this factor, Defendant argues that this Court "has no meaningful ties to the controversy and no particular interest in the parties or subject matter." Defendant's Motion at 10. This is obviously not true.

With respect to TIG Global, the company's headquarters is in the District of Columbia, all but one of its employees work at the company's headquarters, all of its business records are in the District, and it uses the allegedly infringing marks and domain names in the District. Susan Heilbronner Dec. ¶ 4. Under such circumstances, courts in this District have held that the District does have ties to and interests in the parties, controversy, and subject matter of the case. See, e.g., Green, 2005 WL 1330686 at *2 ("[I]t cannot be argued that plaintiff's choice lacks any meaningful ties to the controversy, since plaintiff lives here."); Fund for Animals, 352 F.Supp.2d at 2 (D.D.C. 2005) (denying transfer because, *inter alia*, "Defendants and their counsel are located in this district.").

This District also has ties and an interest to Defendant, its trademarks, and the scope of its trademark rights because Defendant has customers and makes sales under the marks in the District. See Defendant's Motion at 11. Such facts have influenced courts in this District to deny transfers

---

[3]   The private interest factors include: (1) the plaintiff's choice of forum, unless the balance of convenience is strongly in favor of the defendants; (2) the defendant's choice of forum; (3) whether the claim arose elsewhere; (4) the convenience of the parties; (5) the convenience of the witnesses of the plaintiff and defendant, but only to the extent that the witnesses may actually be unavailable for trial in one of the forums; and (6) the ease of access to sources of proof. The public interest considerations include: (1) the transferee's familiarity with the governing laws; (2) the relative congestion of the calendars of the potential transferee and transferor courts; and (3) the local interest in deciding local controversies at home. Kotan v. Pizza Outlet, Inc., 2005 WL 2861165 at *7 n.4 (D.D.C. 2005).

under 1404(a).  See, e.g., Green, 2005 WL 1330686 at *2 (plaintiff's choice of the District is appropriate because "defendant does business here.").  Defendant also holds itself out as having a "Washington, D.C. office" and has employees and important customers in and around the Washington, D.C. area.  Michael Heilbronner Dec. ¶¶ 13-18; Ex. F-K; and Section II.E, infra.

Further under this factor, Defendant's Motion introduces the idea that the alleged infringement is limited to Southern California and Hawaii.  TIG Global doubts that Defendant is willing to concede that the alleged infringement is only a local or regional problem.  Indeed, all of Defendant's other words and conduct contradict the regional infringement concept.  For example, Mr. Hahn's correspondence to Defendant invokes Defendant's **federal** trademark registration rights and the national scope of TIG Global's allegedly infringing conduct, including the use of its domain name.  Michael Heilbronner Dec. ¶ 2, Ex. A, and Susan Heilbronner ¶ 12, Ex. B.  Mr. Hahn also repeatedly demanded that TIG Global cease **all** use of the allegedly infringing marks, including in this District.  Id.  Finally, in its California Complaint, Defendant formally asserts its federal trademark rights, identifies no geographic limitations on the scope of TIG Global's allegedly infringing conduct, claims that its mark is famous in the United States, and seeks national injunctive relief.  Michael Heilbronner Dec. ¶ 11, Ex. D.

In short, this factor weighs heavily in TIG Global's favor.

**2.  Defendant's Choice of Forum**

A transfer of venue is not appropriate when it would merely shift the burden from one party to the other rather than eliminate the inconvenience.  For example, a court in this District recently refused to grant a motion to transfer under § 1404(a) when "transferring the action to [defendant's preferred forum] would merely "'shift the balance of inconvenience from

Defendant to Plaintiff.'" Int'l Painters and Allied Trades Industry Pension Fund v. Tri-State Interiors, Inc., 357 F.Supp.2d at 57 (citations omitted).

Defendant's main argument under this factor is that such a shift of the burden from Defendant to Plaintiff is appropriate because it is will be inconvenient for Defendant to litigate in the District. Defendant must show much more to meet its burden, particularly when it would be extremely burdensome for TIG Global to litigate in California. Susan Heilbronner Dec. ¶¶ 4, 13-14. TIG Global's headquarters is in the District of Columbia, all but one of its employees work at the company's headquarters, all of its business records are in the District, and it uses the allegedly infringing marks and domain names in the District. Id. ¶ 4. TIG Global also has no employees, offices, or physical presence of any kind in California. Id. ¶ 13.

Defendant also suggests without citation that it is the "natural plaintiff" in this action and, therefore, its choice of forum should carry more weight than TIG Global's. This position ignores both the deference courts give to Plaintiff's choice of forum and Defendant's burden of proof under § 1404(a). Defendant's "natural plaintiff" theory also would render the DJA virtually meaningless. To the extent there is a "natural plaintiff," TIG Global is the natural plaintiff in this declaratory judgment action.

### 3. Whether the Claim Arose Elsewhere

Defendant argues that this factor favors transfer because Defendant learned of the alleged infringement from one of its customers in the Southern District of California. The problem with this argument is that the location where Defendant learned of the alleged infringement has nothing to do with where the claim arose. Trademark infringement is not like typical torts – such as a car accident – which occur in one discrete jurisdiction. Rather, claims for federal trademark violations are usually national in scope. When violations occur nationally, they arise nationally

as well.  That is the case here.  Defendant's assertions in correspondence and its California

Complaint allege that Defendant's federal registration rights and TIG Global's national conduct

create the various alleged violations.

Indeed, Defendant's Motion cites cases suggesting that the violation in a trademark dispute

occurs where customers experience confusion.  Defendant's Motion at 11.  TIG Global does not

dispute the legal standard.  The problem with Defendant's argument is that, in all instances other

than its persuasive motion seeking transfer, Defendant alleges that consumers will be confused in

an unlimited geographic area – including the District of Columbia.  Defendant cannot gain a

litigation advantage by regionalizing the dispute for purposes of this motion.

Defendant's cases, communications, and conduct all suggest that this factor favors TIG

Global.

### 4. The Convenience of the Parties

As discussed, merely shifting the benefits and burdens of venue is not a basis for transfer

under § 1404(a).  Thus, this factor will not favor the moving party when "the result of a transfer

would simply be to shift the inconvenience from Defendant's witnesses to Plaintiff's witnesses."

Int'l Painters and Allied Trades Industry Pension Fund, 357 F.Supp.2d at 57.

Defendant argues that it will be inconvenient for Defendant to litigate in the District of

Columbia because of the burdens and disruptions to the company's business that will occur with

its witnesses traveling to the District of Columbia.  Defendant makes this claim despite the fact

that it has an office, employees, and other work facilities immediately across the river in its

"Washington, D.C." office that is located in Vienna, Virginia.  Michael Heilbronner Dec. ¶¶ 13-

16; Ex. F-I; and Section II.E, infra.

Aside from the fact that none of the parties' witnesses would be forced to travel until a trial in one of the jurisdictions, it would be more inconvenient for TIG Global to litigate in California than it would be for Defendant to litigate in this District. TIG Global is a much smaller company (in terms of revenue and employees) than Defendant is. Susan Heilbronner Dec. ¶¶ 14-15. As explained, TIG Global's headquarters is in the District of Columbia, all but one of its employees work at the company's headquarters, all of its business records are in the District, and it uses the allegedly infringing marks and domain names in the District. Id. ¶ 4. Thus, while the parties' face similar burdens and disruptions due to their respective locations, the **impact** of those burdens and disruptions will be much higher for TIG Global because it has fewer resources to absorb and spread the fallout from the burdens and disruptions.

### 5. Convenience of the Witnesses Unavailable for Trial

"[C]onvenience of witnesses is considered only to the extent that the witnesses "'may actually be unavailable for trial in one of the fora.'" Green, 2005 WL 1330686 at *2 ((quoting Wilderness Soc'y v. Babbitt, 104 F.Supp.2d 10, 12 (D.D.C. 2000)). This factor favors TIG Global because Defendant provides no evidence (one way or the other) about whether potential witnesses will be available for trial.

Rather, Defendant merely asserts that relevant witnesses and customers are located in California and Hawaii. With one exception, Paul Corsinita, Defendant does not support the blanket claim by identifying any of these alleged witnesses. More importantly, Defendant provided no evidence that any such witness (1) is or is not within the subpoena power of the federal court in San Diego; or (2) will be available at trial in San Diego. Even Mr. Corsinita does not indicate whether he is within the subpoena power of the San Diego court.

Defendant next argues that litigating this dispute in California "will certainly facilitate the deposition process." Defendant's Motion at 12. This claim is irrelevant (because this factor concerns only whether the witnesses will be unavailable for **trial**) and unsupported by any evidence.

Finally, Defendant again suggests the dispute is limited to Southern California. TIG Global has already demonstrated the invalidity of this premise. Moreover, potential third-party witnesses in this national trademark dispute are located throughout the United States, including the District of Columbia (and otherwise within the subpoena power of this Court). The Washington, D.C. area is one of the largest business and pleasure travel destinations in the world. A very large hospitality service industry serves these travelers' needs, and many local businesses are potential witnesses in this case. Indeed, the headquarters of Marriott International, Inc., one of the largest hospitality companies in the world, is in the District of Columbia. See Michael Heilbronner Dec. ¶ 12, Ex. E. More specifically tied to Defendant are Defendant's many and valued customers (including various federal agencies and departments) located in and around the Washington, D.C. area and served by Defendant's "Washington, D.C." office located in Vienna, Virginia. Michael Heilbronner Dec. ¶¶ 13-18; Ex. F-K; and Section II.E, infra.

### 6. The Ease of Access to Sources of Proof

Defendant's arguments under this factor misapprehend black-letter trademark law and the sources of proof in trademark infringement litigation. A brief review of the standard likelihood-of-confusion factors that will determine the outcome of this dispute[4] demonstrate that at least

---

[4] The factors are (1) the strength of the plaintiff's mark; (2) the degree of similarity between the plaintiff's and defendant's marks; (3) the proximity of the services being offered; (4) the likelihood that the plaintiff will 'bridge the gap' between the products being sold; (5) evidence of actual confusion; (6) defendant's good faith in using the mark; (7) the quality of defendant's services; and (8) the sophistication of the relevant consumer market. Federation Internationale de Football Ass'n v. Nike, Inc., 285 F.Supp.2d 64, 72 (D.D.C. 2003).

half (if not more) of both parties' proof will come from TIG Global, its records, and witnesses –

all of which are located in the District of Columbia.

    A. <u>Strength of Defendant's Mark</u>:  Evidence will come from Defendant but also from TIG Global.  TIG Global will offer evidence of third-party use of similar marks and other evidence weighing against the strength of Defendant's mark.

    B. <u>Degree of Similarity of the Marks</u>:  Evidence will come equally from Defendant and TIG Global.  Each party will offer proof about the nature of its mark.

    C. <u>Proximity of the Services</u>:  Evidence will come equally from Defendant and TIG Global.  Each company will have proof relating to the nature of its services.

    D. <u>Likelihood that Defendant Will Bridge the Gap</u>:  Evidence will come equally from Defendant and TIG Global.  Proof of this factor will come from the same sources as proof for the proximity of services.

    E. <u>Evidence of Actual Confusion</u>:  Evidence will come from Defendant and TIG Global.  TIG Global will offer evidence that there has been no actual confusion, and TIG Global may offer a consumer survey pertaining to actual confusion.

    F. <u>TIG Global's Bad Faith</u>:  This factor is about TIG Global, and evidence will come exclusively from TIG Global.

    G. <u>Quality of TIG Global's Services</u>:  This factor is about TIG Global, and evidence will come primarily from TIG Global.

    H. <u>Sophistication of Customers</u>:  Evidence will come equally from Defendant and TIG Global.  Each company will have proof relating to the sophistication of their respective customers.

At best, for Defendant, this factor weighs evenly for the parties, which falls short of helping

Defendant meets its burden for a motion under § 1404(a).

    Based on the foregoing, almost all of the private-interest factors favors TIG Global, none

favors transfer, and Defendant certainly has not met its substantial burden under § 1404(a).

**7. The Public Interest Factors**

    Defendant also fails to meet its burden with respect to the public interest factors, none of

which favors litigating this dispute in California.

Defendant first argues (without evidence) that, from logistical and case-management standpoints, the Southern District of California appears evenly situated with this Court to hear this dispute. Defendant fails to meet its burden because it has to show that the public interest associated with transfer **outweighs** the corresponding public interest in retaining the case in the District. Merely claiming that there is no difference between the courts does not satisfy Defendant's obligation. Green, 2005 WL 1330686 at *2 ("[D]efendants have not established that there is any difference between the two courts in terms of the size of their dockets or their efficiency.").

Defendant next re-asserts the alleged regional nature of the dispute and argues that transfer will serve the public interest because Defendant's offices are in California and the dispute arose in California. These positions simply rehash Defendant's private-interest arguments, and have nothing to do with the public interest. Moreover, TIG Global has already dispelled the notion that Defendant's allegations and claims for relief are geographically limited. Except when it argues for transfer, Defendant treats this dispute and TIG Global's violation as national – including the District of Columbia.

IV.    **Conclusion**

For the foregoing reasons, the Court should deny Defendant's Motion.

Date: December 13, 2005

Respectfully submitted,

Daniel H. Marti (D.C. Bar No. 481691)
J. David Mayberry (D.C. Bar No. 480603)
**KILPATRICK STOCKTON LLP**
Suite 900
607 14th Street, N.W.
Washington, DC 20005
Phone: (202) 508-5800
Facsimile: (202) 508-5858

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that a copy of the foregoing **Plaintiff's Memorandum in Opposition to Defendants' Motion to Dismiss or, Alternatively, to Transfer, Declaration of Michael Heilbronner in support of same, and Declaration of Susan Heilbronner in support of same** were duly served upon counsel for PC Specialists, Inc. by facsimile (202-942-5999) and depositing a copy with the United States Postal Service as First Class Mail, postage prepaid, in an envelope addressed to:

> Roberta Horton
> Leslie M. Hill
> ARNOLD & PORTER LLP
> 555 12th Street, N.W.
> Washington, DC  20004

This 13th day of December 2005.