UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

THAYER INTERACTIVE GROUP LLC,

    Plaintiff,

v.

PC SPECIALISTS, INC.,

    Defendant.

Civil Action No. 1:05CV01503 (JR)

**REPLY MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANT PC SPECIALISTS, INC.'S MOTION TO DISMISS PLAINTIFF'S
COMPLAINT OR, IN THE ALTERNATIVE, MOTION TO TRANSFER VENUE**

<u>**TABLE OF CONTENTS**</u>

<u>Page</u>

I.      INTRODUCTION ......................................................................................1

II.     RESPONSE TO TIG GLOBAL'S ERRONEOUS AND MISLEADING
        STATEMENT OF FACTS ........................................................................2

        A.    The Parties' Businesses are Related and Competitive............................2

        B.    TIG GLOBAL has Grossly Mischaracterized the Circumstances
              Surrounding the Filing of its Complaint and the Communications Between
              the Parties..........................................................................................4

        C.    TIG GLOBAL has Grossly Overstated TIG's "Presence in and
              Connections to Washington, D.C." ........................................................6

III.    REPLY ARGUMENT .................................................................................9

        A.    TIG GLOBAL's Declaratory Judgment Complaint is a Paradigm
              Preemptive Strike..................................................................................9

        B.    In The Alternative, Venue Should be Transferred to the Southern District
              of California Pursuant to 28 U.S.C. § 1404(a).........................................14

              1.    TIG GLOBAL's Clear Acts of Form Shopping Preclude Any
                    Deference to its Choice of Forum.................................................15

              2.    TIG Has the Substantive Claims in this Dispute and its Choice of
                    Venue Prevails Over TIG Global's..............................................16

              3.    The Convenience of Actual and Potential Witnesses
                    Overwhelmingly Supports a Transfer of Venue .............................17

              4.    The Remaining Factors Relevant to the Venue Transfer Analysis
                    Support a Transfer to the Southern District of California................19

IV.     CONCLUSION...........................................................................................23

i

**TABLE OF AUTHORITIES**

**Page**

CASES

* *Anheuser-Busch Inc. v. Supreme Int'l Corp.*, 167 F.3d 417 (8th Cir. 1999) ............ 11

*Armco Steel Co. v. CSX Corp.*, 790 F. Supp. 311 (D.D.C. 2004) ............ 15

* *Bausch & Lomb, Inc. v. Alcide Corp.*, 684 F. Supp. 1155 (W.D.N.Y. 1987) ............ 10

* *Essex Group, Inc. v. Cobra Wire & Cable, Inc.*, 100 F. Supp. 2d 912 (N.D. Ind. 2000) ............ 15

* *Fed'n Internationale de Football Ass'n v. Nike, Inc.*, 285 F. Supp. 2d 64 (D.D.C. 2003) ............ 11

*Fund for Animals v. Norton*, 352 F. Supp. 2d 1 (D.D.C. 2005) ............ 15

* *Galileo Int'l Partnership v. Global Village Communication, Inc.*, 1996 U.S. Dist. LEXIS 11240 (N.D. Ill. 1996) ............ 12

* *Hunt Mfg. Co. v. Fiskars Oy Ab*, 1997 U.S. Dist LEXIS 15457 (E.D. Penn. 1997) ............ 16

*Int'l Painters and Allied Trades Industry Pension Fund v. Tri-State Interiors, Inc.*, 357 F. Supp. 2d 54 (D.D.C. 2004) ............ 15

*Kmart Corp. v. Key Indus.*, 877 F. Supp. 1048 (E.D. Mich. 1994) ............ 10

*NSI Corp. v. Show, Inc.*, 843 F.Supp. 642 (D. Or. 1994) ............ 13

*Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93 (9th Cir. 1982) ............ 9

* *Pertuit v. Youthspan, Inc.*, 2003 U.S. Dist. LEXIS 2316 (E.D. La. Feb. 13, 2003) ............ 17

*Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48 (D.D.C. 2000) ............ 15

*Ritz Hotel, Ltd. v. Shen Mfg. Co., Inc.*, 384 F. Supp. 2d 678 (S.D.N.Y. 2005) ............ 17

*Sears, Roebuck & Co. v. Sears Financial Network, Inc.*, 576 F. Supp. 857 (D.D.C. 1983) ............ 3

* *Tempco Elec. Heater Corp. v. Omega Eng'g*, 819 F.2d 746 (7th Cir. 1987) ............ 9

*Trout Unlimited v. United States Dep't of Agric.*, 944 F. Supp. 13 (D.D.C. 1996) ............ 15

STATUTES

Fed. R. Civ. P. 45(b)(2) ............ 18

**I.    INTRODUCTION**

TIG GLOBAL's Opposition to TIG's Motion to Dismiss or, in the alternative, Motion to Transfer, is long on invective and mischaracterization, yet short on an accurate depiction of the facts and circumstances underlying the filing of its Complaint and short on persuasive argument against the dismissal or transfer of this action. This case is the epitome of a preemptive strike designed to secure a home court advantage in a trademark dispute that belongs in the forum of the trademark owner's choosing. TIG GLOBAL's decision to file this lawsuit a mere nine days after being placed on notice of its infringing conduct was prompted by neither a subjective nor objective belief that an infringement action by TIG was imminent and that it had no other choice.

TIG GLOBAL's expressed fear of having to "capitulate or litigate" strains credulity. If it truly believed an infringement action was imminent and that it needed a prompt determination of its rights, or that further settlement discussions were pointless, it would have promptly served its declaratory relief Complaint on TIG. Instead, TIG GLOBAL sat on the Complaint for over three months while continuing to advocate settlement in lieu of litigation, even up until two days before it served TIG. TIG GLOBAL has offered no explanation for its conduct in this regard.

If any party here was faced with a Hobson's choice, it was TIG: (1) sue for infringement first and ask questions later, which is neither cost efficient nor amenable to an informal resolution, or (2) place the infringer on notice of the trademark holder's claims as a starting point for a resolution, which the infringer may then seize as an opportunity to secure its chosen forum for the dispute.

TIG should not be punished for the caution it exercised in raising the "sword of litigation," and TIG GLOBAL should not be rewarded for abusing the Declaratory Judgment Act by racing to the courthouse as soon as it was placed on notice of its infringing conduct.

///

1

## II.    RESPONSE TO TIG GLOBAL'S ERRONEOUS AND MISLEADING STATEMENT OF FACTS

In a clear effort to confuse the issues and create an unfounded bias against TIG, TIG GLOBAL has spewed forth an astounding seven pages of purported "facts" regarding the nature of the parties' respective businesses, the communications between the parties before and after the filing of TIG GLOBAL's Complaint, and TIG's business activities in and around the District of Columbia. TIG GLOBAL's allegations are not only erroneous and misleading, they do nothing to alter the conclusion that TIG GLOBAL's declaratory judgment Complaint was a preemptive strike aimed at securing its chosen forum for this dispute.

### A.    The Parties' Businesses are Related and Competitive

TIG GLOBAL's argument that the parties' respective businesses are unrelated and non-competitive is arguably supported only by the self-serving Declaration of Susan Heilbronner that is directly contradicted by TIG GLOBAL's own website and press releases.

Although TIG GLOBAL claims in its Opposition that it is primarily an Internet marketing firm that "supplements" its services by offering a "limited array of website management services," its own website tells a much different story.  On its website, TIG GLOBAL boasts that it is "a full-service hospitality Internet marketing firm that provides *turnkey web presence management* and marketing for the travel industry." (See Exhibit 4 to TIG's Complaint filed in the Southern District of California, attached as Exhibit E to the Declaration of Peter K. Hahn.)  TIG GLOBAL's website further states that the company's services include web site design, web site development and web site maintenance. (*Id.*) By its own admission, TIG GLOBAL solicits potential customers to "outsource the full scope of their web presence management" to TIG GLOBAL. (*Id.*)  Press releases issued by TIG GLOBAL also reveal that the company provides "website development; site hosting and maintenance; content and copy management; [and] search engine optimization." (See Exhibit F to the Reply

Declaration of Peter K. Hahn ("Hahn Reply Declaration").) TIG GLOBAL's services in the area of web site development and management are certainly not as tangential as it suggests.

The services offered by TIG GLOBAL are much broader than it would like this Court to believe, and are in fact similar to services offered by TIG. In its Opposition, TIG GLOBAL completely ignores the sworn testimony of Tom Janecek that website development, website hosting, data warehousing and enterprise storage are part and parcel of the services TIG provides to its clients, including its clients in the hospitality industry. (Declaration of Tom Janecek ("Janecek Declaration"), ¶2.) The services offered by TIG and TIG GLOBAL are not just similar, they are identical. TIG GLOBAL's efforts to minimize the similarities between the parties' service by selectively quoting from one page of TIG's website are unpersuasive.

Not only are the companies' respective services identical,[1] but TIG GLOBAL is soliciting customers in TIG's own backyard. TIG GLOBAL's press releases identify relationships with hotels in Southern California, and specifically in San Diego. (*See* Exhibit F to the Hahn Reply Declaration.) TIG GLOBAL has also recently sponsored an Internet conference in San Francisco. (*See* Exhibit G to the Hahn Reply Declaration.) So not only is TIG GLOBAL offering the same services as TIG, it is offering those services and soliciting business in the same market. TIG GLOBAL's unsuccessful attempts to distinguish and distance itself from TIG speak volumes about the validity of TIG's infringement claims.

///
///
///
///

_____

[1]    Even if the services were not identical, which they are, they are at a minimum related and a trademark infringement claim against TIG GLOBAL still lies. *See, e.g., Sears, Roebuck & Co. v. Sears Financial Network, Inc.*, 576 F. Supp. 857, 863 (D.D.C. 1983).

3

**B.**    **TIG GLOBAL has Grossly Mischaracterized the Circumstances**
**Surrounding the Filing of its Complaint and the Communications**
**Between the Parties**

This lawsuit was plainly a preemptive strike aimed at securing TIG GLOBAL's chosen forum for this infringement action. TIG GLOBAL's painstaking effort to manipulate the motivating force behind the filing of its declaratory relief Complaint and the substance and timing of communications between the parties does not alter this inescapable conclusion.

TIG GLOBAL first complains that TIG's initial cease and desist letter on July 20, 2005 left TIG GLOBAL with only two options -- capitulate or litigate. To the contrary, the cease and desist letter was of the variety typically and routinely used in the trademark context to notify an infringer of the trademark owner's rights in an existing mark and to operate as an opening salvo to settlement discussions to avoid costly litigation. Of course it was forceful and contained a deadline; it would have been entirely pointless without firm conviction. It worked, or so TIG thought when it received a phone call from TIG GLOBAL's counsel two days later that unfortunately proved to be a disingenuous settlement overture. TIG did not fail to disclose the conversation as TIG GLOBAL suggests. For the reasons set forth below, it was hardly worthy of mention because TIG GLOBAL's counsel offered no reasonable resolution of this dispute.

Mr. Hahn's recollection of the conversation differs markedly from Mr. Heilbronner's. Mr. Heilbronner did not even broach the subject of a reasonable settlement that would protect TIG's rights in its registered mark. Mr. Heilbronner merely stated that the companies' businesses were not related and his solution was no solution at all, only a suggestion to maintain the status quo and permit TIG GLOBAL to continue its infringing conduct by using a mark duplicative of TIG's. (Hahn Reply Declaration, ¶ 3.) Although Mr. Heilbronner claimed that the parties' respective industries were unrelated, Mr. Hahn explained that in fact, TIG, like TIG GLOBAL, offered provided web related services to its clientele. (*Id.*, ¶ 4.)

4

Mr. Hahn did not state that TIG would never agree to settle the matter under any circumstance that included the two companies coexisting. Rather, Mr. Hahn invited Mr. Heilbronner to propose a solution other than Mr. Heilbronner's suggestion to maintain the status quo with both companies using their respective names. (Hahn Reply Declaration, ¶¶ 4-5.) Mr. Hahn gave no indication that TIG GLOBAL intended to run to the courthouse and file an infringement complaint. He left the door open for a possible resolution, depending upon what TIG GLOBAL was willing to do so as to avoid infringing TIG's registered mark.

Mr. Hahn never heard back from Mr. Heilbronner. (Hahn Reply Declaration, ¶ 5.) Instead, TIG GLOBAL elected to race to the Courthouse and file *but not serve* its declaratory judgment Complaint. By TIG GLOBAL's own concession, it was *after the filing* of its Complaint that TIG GLOBAL management contacted TIG. (Opposition, p. 5.) Again, TIG GLOBAL offered no potential resolution, only the same tired and factually and legally flawed justification that TIG GLOBAL could continue using its name, that clearly incorporated TIG's mark, because its business was ostensibly unrelated to TIG's. (Hahn Reply Declaration, ¶ 6.) TIG then turned the matter over to its counsel, who was waiting to hear back from Mr. Heilbronner. (*Id.*)

The ball was clearly left in TIG GLOBAL's court at this point, but it did absolutely nothing to bring this matter any closer to resolution. TIG GLOBAL's proffered justification for its immediate filing of a declaratory judgment Complaint -- that it feared an infringement lawsuit by TIG was looming that would force it to rebrand its trade name -- is belied by the fact that it waited nearly *14 weeks* to serve the Complaint. If TIG truly was in imminent fear of a crippling lawsuit as it claims, it would have promptly served its lawsuit to secure prompt resolution of its rights, the very purpose of the Declaratory Judgment Act.

5

Regardless, TIG did not terminate ensuing settlement discussions, as TIG GLOBAL claims. Having not heard back from Mr. Heilbronner for several weeks, Mr. Hahn wrote to him again and demanded that TIG GLOBAL cease its infringing activity which had continued unabated.[2] (*See* Exhibit C to Hahn Declaration.) TIG GLOBAL's claim that it served its Complaint in response is false. TIG GLOBAL completely fails to address the existence or substance of Mr. Heilbronner's October 31, 2005 letter to Mr. Hahn. In that letter, Mr. Heilbronner clearly manifested a desire by TIG GLOBAL to resolve this dispute without resort to litigation. He advised that he would "respond to the underlying substantive allegations and demands" in Mr. Hahn's October 27th letter that week, and stated that TIG GLOBAL "still prefers to resolve this matter amicably." (*See* Exhibit D to Hahn Declaration.) Two days later, TIG GLOBAL served its Complaint.

TIG GLOBAL's underlying intent here is clear. It hoped this matter would simply go away, but filed a declaratory judgment Complaint and kept it in its back pocket so it would have its choice of forum if it did not. TIG GLOBAL's flawed recount of the communications between the parties is but another deceptive and manipulative effort toward that end.

**C.   TIG GLOBAL has Grossly Overstated TIG's "Presence in and Connections to Washington, D.C."**

TIG GLOBAL's devotion of three pages of its Opposition to TIG's alleged "Presence in and Connections to Washington, D.C." is an overt and factually unsupportable attempt to call into question TIG's credibility and overshadow the preemptive nature of TIG GLOBAL's declaratory judgment Complaint. TIG GLOBAL's allegations read more like an argument in

---

[2]   Among other mischaracterizations of the evidence that plague TIG GLOBAL's Opposition, Mr. Hahn did not "rebuke" TIG GLOBAL for contacting TIG directly. (Opposition, p. 6.) Mr. Hahn merely expressed surprise that TIG GLOBAL had done so, especially in light of the fact that Mr. Heilbronner, TIG GLOBAL's counsel, had already established a line of communication regarding settlement with Mr. Hahn, and requested that all future communications take place between counsel. (*See* Exhibit C to Hahn Declaration.)

6

support of personal jurisdiction over TIG in the District of Columbia, which TIG does not dispute. The issue before this Court is not a jurisdictional one. The issue is whether this action should be dismissed or transferred to the Southern District of California because it is a plain act of forum shopping and an abuse of the Declaratory Judgment Act.

TIG GLOBAL has nonetheless painted a picture of a business presence by TIG in the District of Columbia that far exceeds reality. As the accompanying Declaration of Bruce Geier demonstrates, TIG conducts a minimal amount of business in the District. TIG is not opening a new office in Washington, D.C., as TIG GLOBAL contends. (Opposition, pp. 7-8.) TIG has an office in Vienna, Virginia, a District that is separate and distinct from the District of Columbia. TIG recently opened that office, and only began operations at that location a couple of months ago. (See Declaration of Bruce A. Geier ("Geier Declaration"), ¶ 3.) The office is the newest of TIG's nineteen offices in the United States. It is not staffed with a "myriad of employees," as TIG GLOBAL claims. (Opposition, p. 7.) Rather, TIG has nine employees in its Vienna, Virginia office -- eight salespersons and one engineer. (Id.) To say that TIG's Virginia office represents a mere fraction of its overall business would be an understatement. During the last fiscal year, the sales generated by TIG's Virginia office comprised approximately .0015% of the company's total sales for that period. (Id.)

TIG has never hidden the fact that it does business in the District of Columbia. In fact, and through the Declaration of Tom Janecek, TIG was perfectly candid about the amount of sales TIG made to customers in the District of Columbia during the last fiscal year: a fraction of 1%. (Janecek Declaration, ¶ 7.) It should therefore come as no surprise that TIG has issued press releases announcing the opening of its office in Virginia in an effort to attract business from surrounding areas like Washington, D.C., and that it is hosting a grand opening for the same purpose. Relying on word of mouth to announce its new office would hardly be a prudent

7

business decision. TIG certainly cannot be faulted for seeking to expand its business, and issuing press releases and hosting a reception toward that end.

Additionally, TIG GLOBAL's characterization of TIG's contracts and relationships with federal agencies is based on pure speculation and is flat out wrong. Again, it is no secret that federal agencies comprise a segment of TIG's clientele and TIG previously disclosed this to the Court. (Janecek Declaration, ¶ 2.) TIG GLOBAL nonetheless latches on to references on TIG's website to its contracts with the Department of Defense, the General Services Administration, the National Institute of Health and the United States Air force in an effort to demonstrate TIG's "presence" in the District of Columbia. None of those contracts, however, are (1) administered by the respective federal agency in the District of Columbia, or (2) serviced by TIG in the District of Columbia, or even by its office in Virginia. (Geier Declaration, ¶ 4.) It goes without saying that federal agencies do not operate exclusively in the District of Columbia. Just because a company has a contract with a federal agency does not necessarily mean that the company does business with that agency in the District of Columbia.

TIG GLOBAL's heavy reliance on TIG's purported "presence" in the District of Columbia, in any event, is a red herring. The issue here is not a jurisdictional one. The issue is whether TIG GLOBAL filed its declaratory judgment Complaint in anticipation of an infringement lawsuit by TIG. TIG's "presence in and connection to" the District of Columbia has absolutely no relevance to this issue.

///
///
///
///
///

8

## III.   REPLY ARGUMENT

### A.   TIG GLOBAL's Declaratory Judgment Complaint is a Paradigm Preemptive Strike

TIG GLOBAL's conduct in this matter mandates that the Court exercise its discretion to deny applying the first-to-file rule. Any contrary result would punish TIG for seeking to resolve this clear case of trademark infringement, and would reward TIG GLOBAL for racing to the courthouse to secure its chosen forum while purporting to be interested in and amenable to settlement.

The first-to-file rule "is not a rigid or inflexible rule to be mechanically applied, but rather is to be applied with a view to the dictates of sound judicial administration." *Pacesetter Systems, Inc. v. Medtronic, Inc.*, 678 F.2d 93, 95 (9th Cir. 1982). The rule is routinely rejected when the party filing a declaratory judgment action unfairly took advantage of its opponent in a race to the courthouse. Where a declaratory judgment action is filed in anticipation of an infringement action, the infringement action should proceed, even if filed later. *Tempco Elec. Heater Corp. v. Omega Eng'g*, 819 F.2d 746, 749 (7th Cir. 1987). Throughout its Opposition, TIG GLOBAL grossly mischaracterizes the scope of this well-recognized exception to the first-to-file rule and its plain application to this case.

The sum and substance of TIG GLOBAL's argument is that because it subjectively believed that further settlement discussions would be useless, it was justified in filing its declaratory judgment Complaint a few days after it was first notified of its infringing conduct. As a preliminary matter, this argument should be rejected out of hand because it is completely undermined by TIG GLOBAL's own conduct in initiating and continuing settlement discussions for nearly *fourteen weeks*. TIG GLOBAL even contacted TIG directly a couple of days *after* the filing of its Complaint to discuss an "amicable resolution." (*See* Exhibit B to Hahn Declaration.) TIG GLOBAL then sat on the Complaint for over three months, and again reiterated its interest

9

in settlement. (*See* Exhibit D to Hahn Declaration.) If TIG GLOBAL truly believed that further settlement discussion were pointless and that an infringement lawsuit by TIG was imminent, it would have immediately served the Complaint and litigated this lawsuit, and it would not have continued settlement talks with TIG. Instead, TIG remained silent about the Complaint, and assured TIG up until *two days* before it finally served the Complaint that it wanted to resolve this dispute without resort to litigation. (*See* Exhibit D to Hahn Declaration.)

Regardless, TIG GLOBAL's primary reliance on *Kmart Corp. v. Key Indus.*, 877 F. Supp. 1048, 1054 (E.D. Mich. 1994), for the proposition that a subjective belief of the futility of settlement alone precludes application of the pre-emptive strike exception to the first-to-file rule, is misplaced. What TIG GLOBAL conveniently neglects is the objective reasonableness component to the analysis. In *Kmart*, the plaintiff "*justifiably* believed that further negotiations were pointless" after receiving correspondence that indicated that nothing short of total capitulation would be acceptable. *Id.* at 1054 (emphasis added). Here, in contrast, TIG represented through its counsel that it was open to and invited a reasonable settlement proposal from TIG GLOBAL, which TIG GLOBAL stated it would tender. (Hahn Reply Declaration, ¶¶ 4-5.)

Where, as here, the circumstances are less than dire, courts have been more than willing to dismiss or transfer preemptive declaratory judgment actions. In *Bausch & Lomb, Inc. v. Alcide Corp.*, 684 F. Supp. 1155, 1160 (W.D.N.Y. 1987), for example, the court noted that while there may not have been on-going settlement negotiations between the parties, it was apparent that the trademark holder's single cease and desist letter was a bona fide attempt to resolve the dispute outside of court. This alone made it inappropriate for the plaintiff to "raise the sword of litigation" and seek a legal declaration of its rights, when other avenues for resolution of the dispute were open to it. *Id.* at 1160.

10

Further, a significant body of case law indicates that even when faced with an ultimatum that suggests an amicable resolution of a matter may be unlikely, the accused infringer must nonetheless undertake a modicum of effort to explore opportunities for avoiding litigation before rushing to file a preemptive declaratory judgment action. Courts have consistently held suits to be anticipatory when they are filed directly in response to cease and desist letters that contain specific threats of imminent litigation, including specific deadlines. *See Fed'n Internationale de Football Ass'n v. Nike, Inc.*, 285 F. Supp. 2d 64, 68 (D.D.C. 2003); *Anheuser-Busch Inc. v. Supreme Int'l Corp.*, 167 F.3d 417, 419 (8th Cir. 1999).

In *Fed'n Internationale de Football*, FIFA was the holder of the trademark at issue and Nike was the alleged infringer. Nike filed a declaratory judgment complaint in the Southern District of New York, and then sought to transfer or stay the infringement action that FIFA subsequently filed in the District of Columbia. In its last letter to Nike, before the race to the courthouse began, FIFA's counsel wrote: "[M]y client feels that it has no alternative but to seek the protection of the courts to protect its rights from further damage, unless we can find an immediate solution." 285 F. Supp. 2d at 68. The letter closed with a warning: "If we do not receive the relevant information from Nike within that deadline [24 hours], my client has instructed me to inform you that it will initiate formal proceedings against Nike without further notice." *Id.* The very next morning, Nike filed a declaratory judgment action in New York. Given FIFA's looming deadline, the United States District Court for the District of Columbia determined that this plainly was an impermissible "preemptive strike." *Id.* The court therefore denied Nike's motion to transfer or stay the later-filed infringement action by FIFA.

The timeline in the *Anheuser-Busch* case is also remarkably similar to the matter at hand. On December 11, 1996, Supreme, the trademark owner, sent a letter to Anheuser demanding that Anheuser stop all use of the penguin design in its Bud Ice campaign. 167 F.3d at 418. The letter

11

stated that Supreme had authorized its attorneys to take legal action unless Anheuser responded within five days. *Id.* On December 19, 1996, Anheuser filed a declaratory judgment action in the Eastern District of Missouri. On December 24, 1996, Supreme filed a trademark infringement action in the Southern District of Florida. In reaching its decision to apply the preemptive strike exception to the first-to-file rule, the court emphasized that Anheuser had filed its declaratory judgment suit a mere eight days after the cease and desist letter was sent. "Less than two weeks passed from the time Supreme sent its cease and desist letter to Anheuser to the time Supreme filed the Florida action. This short period of time suggests that Anheuser raced to the courthouse to usurp Supreme's forum choice." 167 F.3d at 419.

Thus, the determination that the filing of a declaratory judgment action was anticipatory is by itself sufficient to evoke the preemptive strike exception to first-to-file rule. Here, there is no question that as in *Fed'n Internationale de Football* and *Anheuser-Busch*, TIG GLOBAL filed its declaratory judgment suit directly in response to TIG's cease and desist letter to avoid facing litigation away from its home forum. Merely a ***few days*** after receipt of TIG's initial cease and desist letter, and before even allowing the parties to conduct meaningful settlement discussions, TIG GLOBAL filed its preemptive declaratory judgment action where it would be most convenient for TIG GLOBAL to litigate the dispute.

TIG GLOBAL's deceptive actions go even further. It filed its declaratory judgment action secretly, without serving TIG or informing TIG of the suit. In the meantime, for a period of three months, TIG GLOBAL continued to purport to engage in "good faith" settlement negotiations. Such deceptive conduct is similar to that in *Galileo Int'l Partnership v. Global Village Communication, Inc.*, 1996 U.S. Dist. LEXIS 11240 (N.D. Ill. 1996), where a party threatened with an infringement suit filed a declaratory judgment suit in San Francisco on the date that the trademark owner had set as a deadline to cease use of its mark, and then continued

12

to engage in settlement negotiations without serving the trademark owner with the Complaint. *Id.* at *9. Rather than informing plaintiffs of the declaratory judgment action, Global Village, the alleged infringer, chose to remain silent for over six weeks while the parties engaged in settlement discussions in an attempt to resolve the dispute without resorting to litigation. The court found that it was "difficult not to conclude that Global Village manipulated the situation so as to delay an all but certain trademark infringement action against it in order to choose its own forum for the dispute." *Id.* Under these circumstances, the court in the later-filed infringement action refused to either dismiss or transfer the case to San Francisco. *See also NSI Corp. v. Show, Inc.*, 843 F.Supp. 642, 646 (D. Or. 1994) ("NSI took advantage of the fact that Showw had deferred the filing of expensive and probably protracted litigation because of its belief that settlement negotiations were under way").

The foregoing well-reasoned decisions fully support a finding that TIG GLOBAL's declaratory judgment action meets not just one, but several of the circumstances under which courts will apply the preemptive strike exception to the first-to-file rule. Primarily, TIG GLOBAL's depiction of the scenario as one where the "swords of litigation" were drawn on both sides is inaccurate and unsupported by its very own conduct and representations. Despite the stern tone of TIG's letters, it was subjectively and objectively manifest that there were other avenues for resolution of the dispute open to TIG GLOBAL rather than the mechanism of declaratory judgment. Further, the immediate reaction of TIG GLOBAL to file the suit in its home forum raises a "red flag" of forum shopping. *See Anheuser-Busch*, 167 F.3d at 419. Finally, TIG GLOBAL's deceptive actions in continuing to feign interest in settlement while all the while sitting on its secret declaratory judgment filing point to an impermissible manipulation of the situation so as to enable it to choose its own forum for the dispute. Each of these reasons are sufficient alone to preclude application of the first-to-file rule; this should certainly be the

13

end result where, as here, TIG GLOBAL has engaged in a multitude of conduct that supports the dismissal of its preemptive declaratory judgment Complaint.

TIG GLOBAL's purported fear that it was forced with a choice to "capitulate or litigate" is neither subjectively nor objectively reasonable, and is belied by the timeline of events and TIG GLOBAL's own conduct and representations. TIG GLOBAL cannot have it both ways. If it really wanted to settle this dispute outside of court as represented in telephone conversations with TIG and its counsel and in writing, then its declaratory judgment Complaint filed nine days after receiving notice of infringement was clearly a preemptive strike. If, on the other hand, TIG GLOBAL really believed that that settlement discussions beyond the first telephone conversation between the parties' attorneys were pointless, its continued settlement overtures were disingenuous.

**B.    In The Alternative, Venue Should be Transferred to the Southern District of California Pursuant to 28 U.S.C. § 1404(a)**

TIG GLOBAL completely misconstrues TIG's argument supporting a transfer of venue to the Southern District of California. It is not TIG's position that this action should be transferred merely because TIG has no ties to Washington, D.C. and litigating in the Southern District of California would be more convenient for TIG. (Opposition, pp. 13-14.) Rather, venue should be transferred because (1) TIG GLOBAL's blatant acts of forum shopping preclude any deference from attaching to its choice of forum, (2) it is TIG, not TIG GLOBAL, that has the substantive claim in this trademark infringement dispute, and its choice of forum therefore carries more weight, and (3) the witnesses and evidence central to this dispute are located in or near the Southern District of California.

///

///

14

1.    **TIG GLOBAL's Clear Acts of Form Shopping Preclude Any Deference to its Choice of Forum**

Although courts should normally defer to a plaintiff's choice of forum, this presumption has no application where the plaintiff has engaged in forum shopping.[3]  *Reiffin v. Microsoft Corp.*, 104 F. Supp. 2d 48, 54, n. 12 (D.D.C. 2000); *Essex Group, Inc. v. Cobra Wire & Cable, Inc.*, 100 F. Supp. 2d 912, 916 (N.D. Ind. 2000).

As set forth in Section III.A, *supra*, TIG GLOBAL clearly engaged in forum shopping when it filed is declaratory judgment Complaint a mere nine days after receiving TIG's initial cease and desist letter while simultaneously approaching TIG to discuss settlement.  The court's decision in *Essex Group, Inc. v. Cobra Wire & Cable, Inc.*, 100 F. Supp. 2d 912, is particularly instructive here.  In *Essex*, the defendants sent plaintiffs a cease and desist letter alleging that the plaintiffs were violating defendants' trademark rights.  Shortly after receiving the cease and desist letter, plaintiffs filed a declaratory relief action.  The plaintiffs in *Essex* did not serve defendants with the Complaint until more than two months later, when all settlement negotiations broke down.  *Id.* at 913.  The court deferred to the trademark owner's choice of venue, even though the declaratory judgment action was filed first, holding: "[R]egardless of whether [the Plaintiff's choice of venue] is the more appropriate venue for the resolution of [the

---

[3]    The authorities relied on by TIG GLOBAL for its arguments against transfer do not help its cause, as none of the cited cases involved a declaratory judgment action. Moreover, many of the cases involved unique and particular factual circumstances not present here.  *See, e.g.*, *Int'l Painters and Allied Trades Industry Pension Fund v. Tri-State Interiors, Inc.*, 357 F. Supp. 2d 54 (D.D.C. 2004) (ERISA lawsuit where plaintiff's deference given greater weight in light of ERISA's special venue provision); *Fund for Animals v. Norton*, 352 F. Supp. 2d 1 (D.D.C. 2005) (court particularly familiar with the law, facts and issues of the case by virtue of prior similar lawsuits filed by plaintiff).  Additionally, in several of the cases cited by TIG GLOBAL venue was in fact transferred, thus undercutting TIG GLOBAL's position that venue transfers are rare.  *See Armco Steel Co. v. CSX Corp.*, 790 F. Supp. 311 (D.D.C. 2004); *Trout Unlimited v. United States Dep't of Agric.*, 944 F. Supp. 13 (D.D.C. 1996).

dispute], it is inappropriate for the Plaintiffs to file for a declaratory judgment for the purposes of forum-shopping." *Id.* at 916. The court reasoned:

> Here, Plaintiffs filed their declaratory judgment lawsuit in Indiana seven days after [Defendant] transmitted the second cease and desist letter threatening to bring legal action. Plaintiffs then delayed prosecuting that lawsuit and serving [Defendant] with process in hopes that the parties could amicably resolve the dispute. This procedure, i.e., filing a lawsuit in anticipation of settlement, however, is counterintuitive to general litigation practice. The litigation process is wrought with contention and thus, the initiation of litigation typically seeks to estrange the parties rather than make them more amenable to settlement. Yet, if the Plaintiffs desired to amicably settle the dispute, they could have sought to do so without filing a lawsuit and congesting the court docket by failing to actively prosecute it until settlement negotiations broke off. Instead, the Plaintiffs picked their litigation forum, waited to prosecute the lawsuit, and utilized the lawsuit to encourage settlement discussions. Presented in this fashion, nothing before this court indicates that the Plaintiffs' swift action in filing this action in Indiana was anything more than the "race to the courthouse" sanctioned in *Tempco*.

*Id.* at 915; *see also Hunt Mfg. Co. v. Fiskars Oy Ab*, 1997 U.S. Dist LEXIS 15457 (E.D. Penn. 1997) (holding that defendants' cease and desist letter was merely a first step in settlement negotiations and that plaintiffs' subsequent filing of a declaratory relief action was merely an attempt to deny the "natural plaintiff" its choice of forum).

This is precisely the situation here. TIG GLOBAL surreptitiously filed a declaratory judgment Complaint in an attempt to secure its chosen forum, and then sat on it for over three months while courting and assuaging TIG with the prospect of settlement. The deference normally afforded to a plaintiff's choice of forum has absolutely no application here.

**2.    TIG Has the Substantive Claims in this Dispute and its Choice of Venue Prevails Over TIG Global's**

When two different venues are advocated by opposing parties, the venue advocated by the party with the substantive claim should receive preference over the venue advocated by a declaratory judgment plaintiff. It is TIG, not TIG GLOBAL, that has the substantive claims in

16

this trademark infringement dispute, and its choice of venue should thus carry more weight than TIG GLOBAL's.

In *Pertuit v. Youthspan, Inc.*, 2003 U.S. Dist. LEXIS 2316 (E.D. La. Feb. 13, 2003), the court granted a motion to transfer venue in a copyright declaratory relief action filed by the infringing parties, holding: "[E]quity dictates that the Court should allow the proper plaintiffs who are asserting a substantive claim for infringement, their choice of forum." *Id.* at *22. The Court also held that plaintiffs who "seek a declaration of rights under the Declaratory Judgment Act and do not assert any affirmative claims . . . are not true plaintiffs." *Id.* at *11. In short, deference should be given to the party asserting the substantive claims, not the "plaintiff" filing the parallel declaratory relief action, even though the declaratory relief plaintiffs filed their action first. *See also Ritz Hotel, Ltd. v. Shen Mfg. Co., Inc.*, 384 F. Supp. 2d 678, 684 (S.D.N.Y. 2005) (granting motion to transfer venue and noting that plaintiff's choice of forum is entitled to less deference when plaintiff's action is one for declaratory judgment because a declaratory judgment plaintiff is "more akin to a defendant than an ordinary plaintiff seeking relief.").

Here, TIG GLOBAL has no substantive claims, only a claim for a declaratory judgment of non-infringement. It is TIG that has substantive claims against TIG GLOBAL for trademark infringement and unfair competition. (*See* TIG's Complaint filed in the Southern District of California, Exhibit E to the Hahn Declaration.) TIG's choice of forum -- the Southern District of California -- therefore carries more weight.

3.    **The Convenience of Actual and Potential Witnesses Overwhelmingly Supports a Transfer of Venue**

TIG GLOBAL cannot dispute the fact that the bulk of the witnesses likely to be called in this trademark infringement dispute reside in or near the Southern District of California and thousands of miles from the District of Columbia. It is not for TIG GLOBAL to dictate TIG's potential witnesses in this matter. TIG has already identified one witness, indeed the very

17

witness that brought TIG GLOBAL's acts of infringement to TIG's attention, in the Southern District of California who has reported an instance of actual confusion. (*See* Geier Declaration, ¶ 5, and Exhibit A attached thereto.) TIG further explained that the majority of its hospitality industry business is in California and Hawaii. (*See* Janecek Declaration, ¶ 5.)

Nonetheless, TIG GLOBAL attempts to fault TIG for not being able to specifically identify additional witnesses, to demonstrate those witnesses are not within the subpoena power of the District of Columbia or to demonstrate those witnesses will be available for trial in San Diego. (Opposition, p. 19.) TIG GLOBAL completely misses the point in a transparent effort to deprive TIG an entire pool of actual and potential witnesses that will prove TIG's damages in this infringement lawsuit. This case is in its infancy stages, but already presents the rare circumstance of an instance of ***actual confusion*** by a customer in the Southern District of California. TIG has also established that additional customers in the hospitality industry that are likely to be called as witnesses reside in or near that District. (Janecek Declaration, ¶¶ 5, 9.) Federal Rule of Civil Procedure 45 speaks for itself as to its geographic limitations. *See* Fed. R. Civ. P. 45(b)(2). It is plain to see that if this matter remains in the District of Columbia, TIG will be deprived of the ability to subpoena the very witness who has experienced actual confusion, and an entire pool of witnesses that are likely to be confused.

TIG GLOBAL incorrectly argues that it is TIG's position that this dispute is limited to Southern California. (Opposition, p. 20.) The bounds of TIG GLOBAL acts of infringement are unknown as discovery has yet to begin. Suffice it to say that at this point, all evidence points to the logical conclusion that the witnesses that are likely to be called in this matter reside in or near the Southern District of California. Although TIG GLOBAL claims that potential witnesses are located throughout the United States and specifically in the District of Columbia, TIG has failed

18

to identify any such witnesses with any degree of particularity, other than claiming that Washington, D.C. is a popular travel destination.[4] (Opposition, p. 20.)

Lastly, TIG GLOBAL's attempt to draw into this dispute TIG's "many" federal agency clients in Washington, D.C. as potential witnesses for TIG must be rejected. TIG has already established that none of its contracts with federal agencies are administered or serviced in the District of Columbia. (Geier Declaration, ¶ 4.)

### 4.    The Remaining Factors Relevant to the Venue Transfer Analysis Support a Transfer to the Southern District of California

The three factors addressed above are more than sufficient to warrant a transfer to the Southern District of California. The remaining factors relevant to the Court's analysis likewise support a transfer. For example, this trademark infringement clearly arose in the Southern District of California. In its moving papers, TIG established that in trademark infringement actions, the proper venue is the location where the harm is sustained, *i.e.* where the confusion occurs or is likely to occur. TIG also established that it has received at least one report of confusion from a customer in the Southern District of California, and that the bulk of its hospitality industry business is primarily in California and Hawaii.

TIG GLOBAL does not challenge TIG's authority or evidence on these points. Rather, TIG GLOBAL merely proffers the conclusory proposition, without any supporting authority, that "claims for federal trademark infringement are usually national in scope." (Opposition, p. 17.) TIG GLOBAL's flawed proposition, carried to its logical conclusion, would mean that any district in the country would be a convenient venue for this dispute! This of course is not the case. TIG has established that its claim for trademark infringement and unfair competition arose

---

[4]    The fact that the headquarters of one of TIG's clients, Marriott International, Inc., is in the District of Columbia, is of no moment. TIG's Marriott client is located in the Southern District of California, not the District of Columbia. (Geier Declaration ¶ 5; Corsinita Declaration, ¶ 1.)

19

in the Southern District of California,[5] and that confusion has occurred and is likely to continue to occur in or near that District. TIG GLOBAL's Opposition does nothing to defeat TIG's showing in this regard.

TIG also established transferring the venue for this dispute to the Southern District of California would not merely shift the burden from TIG to TIG GLOBAL, as TIG GLOBAL claims. Because TIG GLOBAL's declaratory judgment Complaint was a preemptive strike that never should have been filed in the first place, it can hardly complain that it will be more inconvenient for it to litigate this dispute in the forum preferred by the owner of the trademark in dispute.

TIG GLOBAL's plea that it would be "extremely burdensome" to litigate in the Southern District of California merely because it is based in the District of Columbia does not impact the fact that it is TIG that has the substantive claims in this dispute. (*See* Opposition, p. 19.) Regardless, TIG GLOBAL's argument on this point should be examined with particular scrutiny. By its own admission, TIG GLOBAL does business *and uses the trademark in dispute* throughout the United States, Europe, Mexico and the Caribbean. (Complaint, ¶ 8.) Given the large tourism industry on the West Coast and in Hawaii, it is more reasonable to presume that TIG GLOBAL does a significant amount of business in or near the Southern District of California. TIG GLOBAL's Opposition is suspiciously silent on this point. In a January 3, 2005 press release, TIG GLOBAL boasted of its business relationships with the Hilton San Diego Airport/Harbor Island and the Balboa Bay Club and Resort in nearby Newport Beach, California. (*See* Exhibit F to Hahn Reply Declaration.) And, on its website TIG GLOBAL proudly displays glowing commentary from a client in San Francisco, California, and profiles a client in the

---

5    TIG does not by any means concede, however, that its trademark infringement claims are limited to the Southern District of California.

20

"American Southwest." (*See* Exhibit 4 to TIG's Complaint filed in the Southern District of California, attached as Exhibit E to the Hahn Declaration.) TIG GLOBAL also recently sponsored an Internet marketing strategy seminar in San Francisco, California. (*See* Exhibit G to Hahn Reply Declaration.) TIG GLOBAL's business is certainly not limited to the District of Columbia, as it leads the Court to believe.

Equally unpersuasive is TIG GLOBAL's cry that it will be more inconvenient to litigate in the Southern District of California because it is a smaller company than TIG and has fewer resources. In a dispute between two companies, one will always be larger than the other. A disparity in size surely cannot serve as an indicator of alleged inconvenience where the party shouting "Goliath" fails to submit any evidence regarding the purported disparity.

The sources of proof are also likely to be located in the Southern District of California. This is a straightforward trademark dispute where TIG GLOBAL is using a mark *identical* to a federally registered mark owned by TIG in connection with services *identical* to those offered by TIG. The determinative issue will be the likelihood of confusion between the parties' respective goods and services. As set forth above, evidence on this issue has been found and is likely to be found through witnesses in the Southern District of California.

In a pained effort to overly complicate this matter, TIG GLOBAL has trumped up purported "sources of proof" in the District of Columbia that are utterly lacking in factual support. For example, evidence regarding the strength of TIG's trademark will come from the nature and extent of TIG's use of the mark, not from TIG GLOBAL or from unidentified third parties. As for the similarity of the parties' marks, they are in plain view identical, and evidence on this point is publicly found on file with the United States Patent & Trademark Office and the parties' respective websites. TIG GLOBAL gives these and the remaining factors relevant to the determination of infringement short schrift, merely arguing in a conclusory fashion that evidence

21

will come from both sides. But that is true in any case. TIG GLOBAL fails to address the *sources* of proof that each side will present, that is, where the "third-party use" is occurring, or where the parties' customers are located that will serve as sources of proof on the sophistication element. And importantly, in this particular case, TIG has an instance of actual confusion in the Southern District of California, and evidence establishing that further witnesses on the issue of confusion are likely to reside in or near that District. (Janecek Declaration, ¶¶ 5, 9.) TIG GLOBAL states that it will offer evidence of lack of confusion, and perhaps a consumer survey, but again fails to identify the *source* of that evidence.

The owner of the trademark in dispute, TIG, is headquartered in the Southern District of California, most of its clients in the hospitality industry are in California and Hawaii, and the instance of actual confusion that prompted this lawsuit arose in the San Diego County. It is plain to see that the sources of proof are, or are likely to be found, in or near the Southern District of California.

Lastly, the public interest factors weigh in favor of transfer. TIG GLOBAL has failed to identify any interest at all that the District of Columbia might have in this dispute, much less a persuasive one. The Southern District of California, in contrast, has an obvious interest in a lawsuit that will determine the trademark rights of a company headquartered within the District, and full familiarity with the applicable law. Moreover, the public record reveals that neither this lawsuit nor the infringement action TIG filed in the Southern District of California has advanced past the pleading stage.

///

///

///

///

22

**IV.    CONCLUSION**

TIG GLOBAL's Opposition goes far to confuse and manipulate the facts underlying this trademark infringement dispute, the relevant issues presented by TIG's Motion and the applicable law, but falls woefully short of demonstrating that its declaratory judgment Complaint is anything but a preemptive strike aimed at securing its chosen forum. The Court should therefore exercise its discretion to dismiss this action in favor of the trademark infringement action filed by TIG in the Southern District of California. In the alternative, and at a minimum, the Court should transfer this action to the Southern District of California, where trademark holder and the party with the substantive claims, TIG, resides, and where the witnesses and sources of proof are located.

Respectfully submitted,

_/ s /_
Roberta Horton (D.C. Bar #413577)
Leslie M. Hill (D.C. Bar #476008)
ARNOLD & PORTER LLP
555 12th Street, N.W.
Washington, D.C. 20004
Telephone: (202) 942-5000

_Of Counsel:_

Callie A. Bjurstrom, Esq.
Michelle A. Herrera, Esq.
LUCE, FORWARD, HAMILTON &
    SCRIPPS, LLP
600 West Broadway, Suite 2600
San Diego, CA 92101-3372
Telephone: (619) 236-1414

DATE: December 20, 2005

21378867.2

23